Marshall C. SPIEGEL, Individually and as a Representative of a Class of Persons Similarly Situated, Plaintiff,

v.

CONTINENTAL ILLINOIS NATIONAL BANK, Robert Paulsen, Samuel Hunt, Charles R. Hall, Edward Bottum and Unknown Defendants, Defendants.

No. 84 C 8255.

United States District Court,
N.D. Illinois, E.D.

April 16, 1985.

Kenneth Ditkowsky, Ditkowsky & Contorer, Chicago, Ill., for plaintiff.

Scott J. Davis, Patricia R. McMillen, Mayer, Brown & Platt, Chicago, Ill., for defendants.

MEMORANDUM OPINION
AND ORDER

ASPEN, District Judge:

This is a "civil RICO" action,[1] filed under 18 U.S.C. §§ 1961 *et seq.* In brief, the complaint alleges that the defendants Continental Bank ("Continental") and several bank officials used a pattern of mail fraud to hide Continental's use of trust income for its own benefit. The plaintiff Marshall Spiegel ("Spiegel") is the sole income beneficiary of the "Oscar Spiegel Trust" ("the Trust"), and he has sued on behalf of a purported class of trust beneficiaries similarly defrauded by Continental. Continental moved to dismiss the case as barred by *res judicata.* In a minute order the Court previously reserved decision on the *res judicata* issue and directed the parties to file supplemental memoranda about whether the complaint states a claim upon which relief can be granted. The parties have done so. For the reasons stated below, the Court grants Continental's motion to dismiss, basing the dismissal in part on the doctrine of *res judicata* and in part on Spiegel's failure to state a claim for relief under RICO.

## I.

The following undisputed history is taken from the complaint and from the papers submitted by the parties.[2] In 1972 Spiegel's father Oscar created a trust which named Spiegel as sole income beneficiary. Continental and a private individual were named as Trustees. Spiegel was to become a trustee upon reaching age 25, which he did in 1981. During that year Spiegel stated that he wanted to act as sole trustee. Continental refused to yield its position as corporate trustee, citing a provision of the trust agreement requiring a corporate trustee.

This dispute spawned suits. In December 1981 Spiegel filed a replevin action against Continental in the Circuit Court of Cook County. Continental reacted by filing a suit in Circuit Court, seeking a declaration that the Trust Agreement required there to be a corporate trustee. The two suits were consolidated, and Spiegel counterclaimed, alleging various breaches of fiduciary duty by Continental. These alleged breaches of fiduciary duty overlap the allegations of fraud in this case.

The Circuit Court upheld Continental's position that the Trust Agreement required a corporate trustee. Spiegel appealed, lost, and the Illinois Supreme Court denied him leave to appeal to that court. So far as we know, Spiegel's fiduciary duty counterclaims are still pending in state court.

On June 15, 1983, while the state court appeal was pending, Spiegel sued Continental in federal court ("*Spiegel I*"), basing jurisdiction on RICO. Like the complaint in this case ("*Spiegel II*"), the complaint there alleged that the defendants engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Spiegel's theory was that the trustees, in effect, converted trust funds for the benefit of Continental. They did this by transferring trust income to principal quarterly. During any given quarter, Continental would use this available income for its own benefit. Spiegel charges that this scheme to use such "float" money was not disclosed to him, and that when he later learned of it, defendants made misleading statements to cover up.[3]

*Spiegel I* was heard by Judge Roszkowski, who granted Continental's motion for summary judgment[4] on the basis that the complaint failed to state a claim for relief under RICO. Spiegel now concedes that Judge Roszkowski was right in that respect. *See* Spiegel's Response to Memorandum in Support of Motion to Dismiss at 4. In particular, the Court held that Spie-

---

1. "RICO" is the common acronym for the "Racketeering Influenced and Corrupt Organization Act," 18 U.S.C. § 1961 *et seq.*

2. Because we looked beyond the face of the complaint in deciding this motion, we convert it to one for summary judgment under Fed.R. Civ.P. 56. *See* Fed.R.Civ.P. 12(b).

3. While the alleged scheme is more complex than indicated by this thumbnail sketch, additional elaboration is not needed for the purposes of this opinion.

4. Judge Roszkowski, like this Court, converted a motion to dismiss into one under Rule 56.

gel had not alleged "a pattern of racketeering activity."[5] Spiegel's RICO claim was predicated solely on alleged violations of the federal mail fraud statute, 18 U.S.C. § 1341. The Court found that Spiegel had not alleged two or more acts of mail fraud and thus had not satisfied RICO's requirement that a violation be based on at least two acts of racketeering activity within a ten-year period. *See* 18 U.S.C. § 1961(5). The Court assumed that a letter written by defendant Paulsen, concerning Continental's policy of reinvesting trust income quarterly, was a predicate act of mail fraud, but held that this act was the only one alleged.

After the *Spiegel I* complaint had been filed, counsel for both parties had exchanged correspondence relating to the state court suit, which we will detail later. Spiegel argued to Judge Roszkowski that two of the letters penned by Continental's counsel were predicate acts of mail fraud. The Court rejected these arguments because the statements were not alleged in the complaint. It added in *dictum* that false statements made between attorneys in the context of pending litigation fall outside the scope of the mail fraud statute. *Spiegel I,* slip op. at 11.

On September 13, 1984, the court in *Spiegel I* denied Spiegel's motion to reconsider the previous dismissal. Eight days later, Spiegel filed *Spiegel II.* The complaint essentially mirrors that of *Spiegel I,* except that it alleges two additional predicate acts of mail fraud—the two letters written by

Continental's lawyer Scott Davis ("Davis"). Continental promptly moved to dismiss *Spiegel II,* claiming that it was *res judicata* in light of the recent dismissal of *Spiegel I.*

## II.

■ Although this case does have an aura of *deja vu* about it, we cannot agree with Continental that the complaint on its face is barred by *res judicata.* Res *judicata,* or "claim preclusion," contains three elements: (1) the final judgment in the previous case must have been "on the merits"; (2) the parties or their privies to the two suits must be identical; (3) the causes of action in both suits must be identical. *See, e.g., Mandarino v. Pollard,* 718 F.2d 845, 849 (7th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 116, 83 L.Ed.2d 59 (1984); *Green v. Illinois Dept. of Transportation,* 609 F.Supp. 1021, 1024 (N.D.Ill. 1985) (Aspen, J.). While the first and second elements were met in this case,[6] the third one was not. " '[A] cause of action consists of a single core of operative facts which give[s] the plaintiff a right to seek redress for the wrong concerned.' " *Green,* 609 F.Supp. at 1024, *quoting Lee v. City of Peoria,* 685 F.2d 196, 200 (7th Cir.1982). *Res judicata* bars claims for relief which were actually raised in the first suit and also claims which could have been raised. *Id.*

■ The problem with Continental's *res judicata* defense is that *Spiegel II* is based

---

**5.** RICO redresses injuries "to business or property," 18 U.S.C. § 1964(c), by reason of "a pattern of racketeering activity" conducted by "any enterprise." 18 U.S.C. § 1962. A "pattern of racketeering activity" means at least two acts of such activity within ten years. 18 U.S.C. § 1961(5). "Racketeering activity" includes several state law offenses, as well as several ones which fall under Title 18. Thus, in general, civil RICO actions must be predicated on two or more specific indictable offenses. *See generally Haroco v. American National Bank & Trust Co.,* 747 F.2d 384, 386–87 (7th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 902, 83 L.Ed.2d 917 (1985).

**6.** Although the first suit was dismissed for failure to state a claim upon which relief could be

granted, such dismissals are generally considered to be "on the merits" for *res judicata* purposes. *See Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 399 n. 3, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981); *Cannon v. Loyola University,* 609 F.Supp. 1010, 1015–1016 (N.D.Ill. 1985) (Aspen, J.), *generally* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure,* § 4439 (1981) at 354–62. Because Judge Roszkowski plainly addressed the merits of the *Speigel I* complaint, that dismissal could have *res judicata* effect under the first prong of the test. As for the second factor, the parties do not dispute that they were themselves in *Spiegel I.*

on acts which occurred *after Spiegel I* was filed. These acts could not have been raised in the *Spiegel I* complaint, and indeed, Judge Roszkowski prevented Spiegel from relying on these acts in contesting the summary judgment motion. In *Green* we rejected a proposed rule of *res judicata* that would impose on a plaintiff a duty to amend a suit to include new causes of action as they accrue. 609 F.Supp. at 1025–1026. While Continental is correct that the Court of Claims imposes a duty to amend in cases before it,[7] we rejected that rule as unsound. *Id.; see generally* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure*, § 4409 (1981) at 76–77. In sum, then, we believe that the doctrine of *res judicata* does not bar *Spiegel II* to the extent it is based on acts which occurred after *Spiegel I* was filed.

However, the only thing sparing *Spiegel II* from clutches of *res judicata* is the allegation of two new predicate acts of mail fraud. In all other relevant respects, *Spiegel II* is a reincarnation of *Spiegel I* and satisfies the three elements of *res judicata*. As noted earlier, Judge Roszkowski remarked *in dictum* that those two alleged predicate acts of mail fraud could not be the basis of a mail fruad violation and, it follows, a RICO claim. In light of that strong *dictum*, and of the fact that this suit survives only by virtue of those two alleged acts, we directed the parties to brief the issue. The parties agree that this issue is one of first impression. We conclude below that Judge Roszkowski was essentially right.

### III.

■ Before discussing the two letters in issue, we need to describe the context in which the letters were written. In early 1983, after Spiegel had lost in Circuit Court, but while his appeal was still pending, he asked that Continental transfer the Trust assets to another corporate trustee, the First National Bank of Highland Park ("FNB"). Continental agreed to do so. However, Continental wanted to be reimbursed from the Trust's assets for attorneys' and trustees' fees spent in litigating the issue of whether the Trust Agreement required a corporate trustee. Continental believed that Illinois law entitled it to such reimbursement.[8] On June 29, 1983, it petitioned the Circuit Court to award it fees, but the court denied the petition, holding that it lacked jurisdiction during Spiegel's pending appeal.

Continental resorted to a self-help remedy. It decided to deduct some $40,000 of its claimed $60,000 in fees and expenses from the Trust's assets just before transferring them to FNB. Continental's counsel Davis sent Spiegel's lawyer a letter dated July 13, 1983, which mostly discussed the mechanics of the transfer of assets. However, the letter also discussed the deduction of fees and expenses. In relevant part, Davis wrote:

> You asked in your letter about the disposition of the Albuquerque, New Mexico municipal bond due on July 1, 1983. That maturing bond was collected on July 1, 1983 and the proceeds credited to the Trust's account. Continental will shortly send a check (or checks) to FNB and Marshall Spiegel for the Trust's cash as of the date the check or checks are mailed. (If any dividends are collected on the Trust's securities (other than municipal bonds) prior to their reregistration and transfer, we will send those dividends as well. We will also send the amount collected for the coupon on the Oregon State bond.) However, much of

---

7. *See, e.g., Everett Plywood Corp. v. United States,* 512 F.2d 1082, 1087 (Ct.Cl.1975).

8. Continental relies on several Illinois cases in support of its position. *See Hamilton v. Nielsen,* 678 F.2d 709, 714 (7th Cir.1982) (interpreting Illinois law); *Templeton v. Continental Illinois National Bank,* 429 F.Supp. 1294, 1303–04 (N.D. Ill.1977) (same); *Northern Trust Co. v. Continen-* *tal Illinois Nat'l Bank,* 43 Ill.App.3d 169, 200–02, 1 Ill.Dec. 767, 356 N.E.2d 1049 (1976), *aff'd in relevant part,* 68 Ill.2d 502, 12 Ill.Dec. 248, 369 N.E.2d 1262 (1977). We of course express no opinion on Continental's purported right to fees, but we do note that on the basis of these cases it at least appears to have a good faith basis for requesting those fees.

the Trust's cash was used to pay some of Continental's attorneys' and trustees' fees and expenses. Continental will shortly send to Marshall Spiegel a final cash statement showing the amount so used.

We do not expect you to agree that this payment of fees and expenses was proper. On the other hand, we believe that Continental is (and will in the future be) entitled to receive from the Trust's assets substantially more than the amount already taken for fees and expenses. We intend to promptly file with the Chancery Court a petition covering fees and expenses. This is a matter that ultimately must be decided by Judge Holzer.

Exhibit 5 attached to Spiegel's Complaint at 2–3. Spiegel's complaint alleges that this deduction of fees and the letter sent describing it amounted to a predicate act of mail fraud.[9] On September 13, 1983, after working out more of the mechanics of the transfer of the assets, Davis sent a letter to both Spiegel's counsel and William Eifrig, an officer at FNB. Again, the letter discussed a variety of mundane business matters, and then repeated Continental's position on fees:

As noted in Continental's June 29, 1983 motion for approval of its account and for payment of fees and expenses and its Fee Petition of September 13, 1983, (copies of which are enclosed to Mr. Eifrig), the Trust owes Continental a substantial amount of attorneys' fees and expenses. As of June 6, 1983, the total amount of attorneys' and extraordinary trustees' fees and expenses incurred by Continental was $102,881.65; of this amount, Continental was entitled under Illinois law to receive immediately $61,138.58. On July 1, 1983, Continental deducted from the Trust's assets $40,409.31 for fees and expenses, which was substantially less than the $61,138.58 it was entitled to receive immediately as of June

6, 1983. These deductions were reflected in the cash statements sent by Robert Paulsen to Mr. Eifrig on July 19, 1983.

As the Fee Petition reflects, there has been extensive activity in the state and federal litigation since June 6, 1983. Continental has incurred additional attorneys' fees and expenses of $66,375.60 from my firm alone for the period from June 7, 1983 through August 18, 1983. Continental intends to use every means at its disposal to recover these amounts, as well as the unpaid amount of $62,472.34 that it previously incurred. The total amount of unpaid fees and expenses stands as of August 18, 1983 at $128,847.94.

For the reasons set forth in Continental's June 29 motion and September 13 Fee Petition, Continental is presently entitled to be reimbursed from the Trust for $53,917.07 in fees and expenses and is very likely to be entitled to the remaining $74,930.87 in unpaid fees and expenses at the close of the litigation between Marshall Spiegel and Continental. Continental demands that the $128,847.94 which it has incurred in fees and expenses and for which it has not been paid be deducted from the Trust's assets and placed in escrow within FNB pending termination of the litigation.

Because of the high cost of the litigation, Continental further demands that FNB maintain the non-real estate holdings of the Trust in a secure, liquid form in order to satisfy the ultimate amount of fees and expenses which the Trust will owe to Continental when the litigation terminates. Given the manner in which Marshall Spiegel is conducting the litigation, it is very likely that all of the Trust's non-real estate assets will be consumed for such fees and expenses. Moreover, it would not be surprising if one or both parcels of the Trust's real estate had to be sold to satisfy fee bills if

---

**9.** Paragraph 9 of the Complaint alleges that the first three sentences of the July 13 letter excerpt were "not true as the funds from this bond were embezzled by the defendants herein and not furnished to [FNB]." This allegation certainly strains credulity, since the rest of the letter, which was not quoted in the complaint—clearly discloses that some of the funds were deducted. It is thus hard to see what is "untrue" or at all misleading about the first three sentences.

this litigation continues at the present pace. Continental holds FNB responsible for ensuring that the Trust's assets are available to pay Continental's fees and expenses. Continental will proceed against FNB itself for these fees and expenses if the Trust's assets are not available. In light of these facts, it would be prudent for FNB to refuse to permit substantial amounts of the Trust's assets to be placed into risky ventures or transferred away from FNB.

Exhibit 4 to Spiegel's Complaint at 2–3. A copy of this letter was sent to Circuit Judge Holzer, who was presiding over the state court case and fee dispute. Spiegel claims that this letter was another predicate act of mail fraud. The issue is whether these two letters are indeed predicate acts of mail fraud.

Judge Roszkowski had this to say in *dictum* about the issue:

> In the view of the court, false statements made between attorneys in the context of pending litigation are outside the scope of the mail fraud statute. No fiduciary duty exists and the parties are dealing at arm's length. *See, e.g., Pit Pros, Inc. v. Wolf,* 554 F.Supp. 284 (N.D.Ill.1983) and *Salisbury v. Chapman,* 527 F.Supp. 577 (N.D.Ill.1981). The appropriate remedy in such a case would be to lodge a complaint with the appropriate disciplinary body or apply to the court for assistance. A RICO action for treble damages is hardly an appropriate solution. . . .

*Spiegel I,* slip op. at 11. We agree in general with this statement, although—because it was briefly made in a passing *dictum*— it needs some elaboration and refinement.

The mail fraud statute punishes schemes to defraud where the mails were used to further the schemes. *See, e.g. Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). It is not clear to us what "scheme" Spiegel is alleging was furthered by the two letters at issue. It appears (so we will assume) that the "scheme" was one to embezzle thousands of dollars of trust assets under the guise of claiming it as attorneys' fees.[10] We do not think the mail fraud statute was intended to embrace this purported scheme.

First of all, we find it hard to fathom exactly how the scheme was "fraudulent" in any typical sense of the word. As Spiegel notes in his memorandum, fraudulent schemes typically involve covering up illicit acts through false pretenses, failing to disclose material facts when there is some duty to do so, making false statements or ones with reckless disregard to their truth. *See, e.g., United States v. Bush,* 522 F.2d 641, 646 (7th Cir.1975). As we read the letters in the context of the record before us, we find that Continental's lawyer twice wrote Spiegel's lawyer asserting Continental's purported right to fees concerning a pending case between the parties. So far as we can tell, no lies were told and nothing was hidden.[11] Indeed a copy of the second letter was sent to the judge presiding over the pending litigation, and the first letter invited confrontation on the issues: "We do not expect you to agree that this payment of fees and expenses were proper. . . . We intend to promptly file with the Chancery Court a petition covering fees and expenses. This is a matter that ultimately must be decided by Judge Holzer." The impropriety, if any, was the act itself of deducting the fees from the trust assets. But this was fully and promptly disclosed to Spiegel's lawyer and to the judge. If this act of self-help was

---

**10.** The Complaint also implies that the scheme was fraudulent in that the amount claimed for fees is allegedly exaggerated and unwarranted. *See* Paragraph 8(c).

**11.** The complaint does allege several material non-disclosures concerning the September 13 letter. *See* Paragraph 7. Even if these "non-disclosures" were somehow material, they were "omitted" from a letter of one attorney to opposing counsel in the context of adversarial litigation. Several of the "omissions" were obviously already known to opposing counsel. As for any others, we see no duty to disclose such facts given the context of opposing attorneys dealing at arm's length. Spiegel has failed to show that Continental's counsel had any fiduciary or other duty to disclose those facts in that context.

improper or unlawful, the court in that case had power to order repayment of the fees and possible sanctions on counsel. Even assuming the act was improper, it was not, we believe, a violation of the mail fraud statute. Congress could not have intended that the mail fraud statute sweep up correspondence between attorneys, dealing at arm's length on behalf of their parties, concerning an issue in pending litigation, especially where the presiding judge is aware of the alleged scheme and will ultimately rule on the acts in question.

Although this is a case of first impression, several cases and established principles bolster our holding. Fraudulent schemes which might arguably fall within the language of the mail fraud statute are still outside of its embrace if Congress did not intend that the statute apply to such schemes. *See United States v. Boffa,* 688 F.2d 919, 929 (3d Cir.1982) (scheme to defraud employees of National Labor Relation Act not within mail fraud statute where Congress intended NLRA to be exclusive), *cert. denied,* 460 U.S. 1022 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983). Subjecting the letters in issue to the mail fraud statute would chill an attorney's efforts and duty to represent his or her client in the course of pending litigation. It also would, as it did here, give birth to collateral suits. Where, as here, the court in the first, pending case can fully protect the rights of the parties from abuse or unethical conduct, we see no reason to torture the limits of the mail fraud statute to allow such collateral suits. We do not think Congress intended such a result where alternate remedies exist. *Cf. United States v. Gallant,* 570 F.Supp. 303, 309–10 (S.D.N.Y. 1983) (scheme to sell bootleg records through mails not within mail fraud act where, *inter alia,* copyright laws adequately deal with offense). Finally, such a collateral suit would require this Court to touch upon issues which are pending already in the state court suit. We think that concerns of comity counsel against reading the mail fraud statute broadly to cover this context. *Cf. Colorado River Water Conserv. Dist. v. United States,* 424

U.S. 800, 817–19, 96 S.Ct. 1236, 1246–47, 47 L.Ed.2d 483 (1976) (abstention due to pending state litigation). This was simply a case of lawyers aggressively pursuing their client's interests in pending litigation, and fully disclosing to their adversaries and the Court what they had done. We express no opinion on the propriety of deducting attorneys' fees from the trust corpus. Even if this act can be viewed as "pulling a fast one," it is not the proper subject of a collateral RICO suit in federal court predicated on an extremely broad reading of the mail fraud act.

Spiegel's contentions to the contrary, that the parts of the letters he objects to were not written in the context of pending litigation, are unpersuasive. We also find his reliance on *Schacht v. Brown,* 711 F.2d 1343 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983), misplaced. *Schacht* involved a RICO claim against, among others, accountants who allegedly played an active part of the fraudulent scheme. Here the attorneys are not principals in the scheme. More importantly, it is significant (as we have emphasized) that the attorneys wrote the letters in the context of pending litigation. Policy reasons, including protecting the attorney-client relationship, preventing collateral litigation, and respecting concerns of comity, led us to find that these letters fell outside of the mail fraud statute. Simply labelling accountants and attorneys as "professionals," as Spiegel does, does not prove that *Schact* is controlling or even relevant.

This is not to say that if a client somehow induced an unwary lawyer to write a letter which furthered a fraudulent scheme that the client would necessarily escape the mail fraud statute. Nor should our opinion be read to immunize lawyers who are principals in a fraudulent scheme. But this is not such a case. Moreover, we are aware of and agree with cases which have read RICO broadly to encompass many varieties of unscrupulous conduct. *See Haroco v. American National Bank & Trust Co.,* 747 F.2d 384 (7th Cir.1984) (RICO does not

require allegation of "racketeering injury"), *cert. granted,* — U.S. —, 105 S.Ct. 902, 83 L.Ed.2d 917 (1985); *Schact v. Brown,* 711 F.2d at 1353–56 (RICO may embrace "ordinary" business frauds). But RICO still must be predicated on, in this context, two or more mail fraud violations. And the mail fraud statute, while also broad, does not extend to this case.

█ Even if the mail fraud statute could somehow be stretched to cover this case, we think that no claim for relief has been stated since the mailings could not have "furthered" the scheme. When the July 13, 1983 letter had been sent, Continental had already deducted the fees, and the letter simply *disclosed* the *fait accompli.* Where a mailing is made after a scheme has reached its fruition, it does not "further" the scheme and cannot support a mail fraud conviction. *See United States v. Maze,* 414 U.S. 395, 401–02, 94 S.Ct. 645, 649, 38 L.Ed.2d 603 (1974); *United States v. Ledesma,* 632 F.2d 670, 677–78 (7th Cir.), *cert. denied,* 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980). It is true that mailings "made to promote the scheme," or "which relate to the acceptance of the proceeds of the scheme," or "which facilitate concealment of the scheme" are exceptions to this rule. *See Ledesma,* 632 F.2d at 677–78 n. 11. But this case does not fall within any of these exceptions. Indeed, far from "concealing the scheme" the two letters fully disclosed the already accomplished "scheme," one of them disclosing it to a judge. The mailings did not lull Spiegel (or counsel) into false security, cause delay or otherwise further the scheme; rather, the disclosure *increased* the possibility that the scheme—if unlawful—would be remedied, and thus it cannot as a matter of law be said to have furthered the scheme. *See Maze,* 414 U.S. at 403, 94 S.Ct. at 650.

In sum, then, we conclude that the two letters fall outside the scope of the mail fraud statute.[12] We are thus, as Judge Roszkowski was, left with one alleged

predicate act of mail fraud. The rest of the RICO claim must be dismissed as barred by *res judicata,* since it is *Spiegel I* revisited. Because the RICO claim was the only federal claim in the suit, our pendent jurisdiction over the state law claims is dissolved, and the complaint as a whole must be dismissed. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 716, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). It is so ordered.

---

**12.** In light of our holding, we need not decide whether there is a genuine issue of fact about