Marshall C. SPIEGEL, individually and as a representative of a class of persons similarly situated, Plaintiff-Appellant,

v.

CONTINENTAL ILLINOIS NATIONAL BANK, Robert Paulsen, Samuel Hunt, Charles R. Hall, Edward Bottum, and unknown defendants, Defendants-Appellees.

No. 85–1871.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1985.

Decided May 13, 1986.

Rehearing and Rehearing En Banc Denied June 11, 1986.

Before BAUER and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

The district court dismissed Marshall C. Spiegel's ("Spiegel") civil RICO action[1] on the grounds of *res judicata* and for failing to state a claim, Spiegel appealed. We affirm.

### I

Marshall Spiegel, the plaintiff-appellant in the present case, filed three separate lawsuits against the defendants-appellees herein, arising out of a dispute over the defendants' management of a trust established by the grantor Oscar Spiegel for the benefit of his son, Marshall. For convenience, we shall refer to Spiegel's initial action filed against the defendants-appellees in the Circuit Court of Cook County, Illinois as the "state court litigation." Spiegel subsequently filed two lawsuits in the United States District Court for the Northern District of Illinois. Spiegel's federal actions shall hereinafter be referred to as *"Spiegel I"* and *"Spiegel II."* The present appeal is from the district court's dismissal of *Spiegel II.*

### State Court Litigation

In 1972, Oscar Spiegel, Marshall Spiegel's father, established a trust naming Marshall as the sole income beneficiary[2]

Kenneth Ditkowski, Ditkowsky & Contorer, Chicago, Ill., for plaintiff-appellant.

Scott J. Davis, Mayer, Brown & Platt, Chicago, Ill., for defendants-appellees.

1. The Racketeering Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.,* provides a civil remedy of treble damages to "[a]ny person injured in his business or property by reason of a violation of" 18 U.S.C. § 1962. 18 U.S.C. § 1964(c). Section 1962 prohibits, *inter alia,* persons associated with an enterprise involved in interstate commerce from conducting the affairs of the enterprise through a "pattern of racketeering activity." To establish a pattern of racketeering activity, the plaintiff must prove the defendant committed at least two predicate acts of racketeering activity within ten years. "Racketeering activity" is defined as any act chargeable under various state criminal laws, and any act which is indictable under various sections of Title 18, including section 1341 relating to mail fraud.

2. The trust agreement provides:
    "While my son, MARSHALL C. SPIEGEL, is living, the Trustees may use for his benefit so much of the income of his trust as the Trustees determine to be required, in addition to his other income from all sources known to the Trustees, for his reasonable support, comfort and education adding any excess income to the principal at the discretion of the Trustees.
    \* \* \* \* \* \*
    ... [A]fter attaining age forty (40) he may withdraw any part or all of such trust....
    Upon the death of my son, MARSHALL, after my death, or if he should die before complete distribution is made to him, the Trustees shall divide the trust as then constituted with any undistributed income therefrom into separate trusts, ... one for each then living child of

and naming an aunt of Marshall's and the Continental Illinois National Bank as trustees. Oscar Spiegel died in 1973. The trust agreement provided that Marshall would become a trustee upon reaching the age of 25. Upon turning 25 in 1981, Spiegel, desiring to act as sole trustee, removed his aunt as trustee,[3] and also attempted to remove Continental. Continental contested Marshall's removal of it as a trustee, and refused to turn over the trust assets to the plaintiff pursuant to its interpretation of the trust agreement. They contended that the language of the trust required a qualified corporate trustee.[4] Spiegel filed a replevin action in the Circuit Court of Cook County requesting the court to order Continental to relinquish its custody of the trust assets. Continental responded with the filing of an interpleader action in the Cook County Circuit Court seeking a determination of whether the trust agreement required a corporate trustee. The two suits were consolidated in the Circuit Court and Spiegel filed a counterclaim in the consolidated action in the Circuit Court alleging that Continental had breached its fiduciary duty to him. The Circuit Court, after a hearing, ruled that the trust agreement not only required a corporate trustee, specified its duties and further ruled that Marshall Spiegel could not act as the sole trustee. The court went on to direct Continental to continue as corporate trustee until such time as Spiegel selected and a qualified successor corporate trustee agreed to assume the trustee's duties.[5] Spiegel appealed the decision of the Circuit Court to the Illinois Appellate Court, who affirmed, and the Illinois Supreme Court denied Spiegel leave to appeal. The record fails to reflect whether Spiegel's counterclaims alleging a breach of fiduciary duty have been adjudicated in the Illinois State Court to date.

my son and one for then living descendants, collectively, of each deceased child of my son."

Thus, while Marshall is living, he is the sole income beneficiary of the trust.

3. Paragraph 4.15 of the trust agreement provides in part:

"A majority in interest of the [income beneficiaries] may remove a Trustee upon giving ten (10) days' written notice to such Trustee, fill such vacancy or any vacancy caused by the resignation of a Trustee and ... may approve the accounts and give full release and discharge to any such removed or resigning Trustee which shall be binding upon all persons whomsoever with the same force and effect as though such accounts were approved by a court of competent jurisdiction. Each successor Trustee appointed hereunder must be a corporation situated in the continental United States of America and have capital of not less than ten million dollars."

Marshall Spiegel bases his claimed authority to remove trustees upon the fact that as sole income beneficiary he obviously possesses a majority in interest of the income beneficiaries.

We have found no evidence in the record that Spiegel's aunt resisted her removal as trustee. Further, Ill.Rev.Stat.Ch. 17, ¶ 1653(1) provides:

"A person establishing a trust may specify in the trust instrument the rights, powers, duties, limitations and immunities applicable to the trustee, beneficiary and others and those provisions where not otherwise contrary to law shall control, notwithstanding this Act. [Trust and Trustees Act]"

Our research has failed to disclose any Illinois statute or decision which would preclude the person establishing a trust from investing the beneficiaries of the trust with the power to remove a trustee pursuant to the terms of the trust agreement or requiring that a beneficiary obtain court approval in order that he might remove a trustee. "The law appears firmly settled in Illinois that where a testator specifies in what manner a successor trustee is to be appointed, such a fiduciary can succeed to the trust in no other way." *DeKorwin v. First National Bank of Chicago*, 84 F.Supp. 918, 935 (N.D.Ill.1949) "By so stipulating in the trust agreement, the settlor may reserve the power [to remove a trustee] to himself, or vest it in a beneficiary...." Bogert, Trusts & Trustees § 520 (Rev.2d Ed.).

4. Continental did not challenge Spiegel's authority to remove it as trustee, but contended that its removal could not be effective until such time as Spiegel had named a successor corporate trustee. In support of its position, Continental cited, *inter alia*, ¶ 4.19 of the trust agreement providing, "The corporate Trustee shall have custody of all investments and cash from time to time comprising the trust estate and may perform by itself all ministerial duties."

5. The trust agreement limited Spiegel's selection of a successor corporate trustee to corporations located in the continental United States with at least ten million dollars of capital.

*Spiegel I*

In June of 1983, while Spiegel's appeal was pending in the Illinois State Court system, he filed a complaint in the United States District Court for the Northern District of Illinois individually as a beneficiary of the Oscar Spiegel trust and also as trustee of the Oscar Spiegel trust, and as a "representative of a class of persons similarly situated." (*Spiegel I*) In this complaint (*Spiegel I*) Spiegel alleged that the defendants, Continental Illinois National Bank, Robert Paulsen, Samuel Hunt, Charles R. Hall, and Edward Bottum (Continental employees), had engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and were liable for treble damages under RICO. Spiegel's RICO claim alleged that Continental converted trust funds to its own benefit in failing to invest the trust income promptly (trust income was transferred to principal on a quarterly basis) and in using the trust income for Continental's benefit prior to transferring the trust income to principal. According to Spiegel, the quarterly financial statements Continental mailed to all trust beneficiaries were fraudulent in that they failed to disclose that Continental received profits from its use of the uninvested trust income. The plaintiff also alleged that when he inquired about Continental's policy regarding the investment of trust income, the defendant Robert Paulsen, the Spiegel account executive and a trust officer at Continental, sent a letter to Spiegel dated June 10, 1982, in which he fraudulently misrepresented the applicable regulations of the Comptroller of the Currency and the laws of the State of Illinois in stating, "We have been prohibited from investing income cash by applicable law and regulation, unless it is first transferred to principal by terms of the trust document."

After the filing of *Spiegel I* in the U.S. District Court, the parties exchanged correspondence dealing with the pending state court litigation. At this time, while Spiegel's appeal was pending in the state court, Spiegel directed Continental to transfer the assets of the trust to the First National Bank of Highland Park ("Bank of Highland Park"), informing Continental that they would act as the qualified corporate successor trustee. Continental agreed to transfer the assets, petitioned the circuit court to be reimbursed from the trust assets for the attorneys' and trustee's fees incurred in litigating the question of the necessity of a corporate trustee. On June 29, 1983 the Cook County Circuit Court denied Continental's petition on the grounds that since the case was on appeal to the Illinois Appellate Court they had lost jurisdiction over the subject matter and were thus unable to decide the question of Continental's entitlement to attorneys' fees. On July 1, 1983, Continental deducted some $40,409.31 of the $61,138.58 it claimed in fees and expenses from the trust assets before the transfer to the Bank of Highland Park. An attorney for Continental, Scott Davis ("Davis"), sent a letter dated July 13, 1983, to Spiegel's lawyer discussing, *inter alia,* Continental's deduction of the $40,409.31 claimed as fees and expenses. The July 13 letter read in part:

"You asked in your letter about the disposition of the Albuquerque, New Mexico municipal bond due on July 1, 1983. That maturing bond was collected on July 1, 1983 and the proceeds credited to the Trust's account. Continental will shortly send a check or (or checks) to [the Bank of Highland Park] and Marshall Spiegel for the Trust's cash as of the date the check or checks are mailed. (If any dividends are collected on the Trust's securities (other than municipal bonds) prior to their reregistration and transfer, we will send those dividends as well. We will also send the amount collected for the coupon on the Oregon State bond.) However, much of the Trust's cash was used to pay some of Continental's attorneys' and trustees' fees and expenses. Continental will shortly send to Marshall Spiegel a final cash statement showing the amount so used.

We do not expect you to agree that this payment of fees and expenses was

proper. On the other hand, we believe that Continental is (and will in the future be) entitled to receive from the Trust's assets substantially more than the amount already taken for fees and expenses. We intend to promptly file with the Chancery Court a petition covering fees and expenses. This is a matter that ultimately must be decided by [the Cook County Circuit Court]."

Two months later, on September 13, 1983, Davis sent another letter to Spiegel's counsel and William Eifrig, an officer of First National Bank of Highland Park that, in addition to discussing various matters regarding the transfer of the trust assets, restated Continental's position on fees:

"As noted in Continental's June 29, 1983 motion for approval of its account and for payment of fees and expenses and its Fee Petition of September 13, 1983, (copies of which are enclosed to Mr. Eifrig), the Trust owes Continental a substantial amount of attorneys' fees and expenses. As of June 6, 1983, the total amount of attorneys' and extraordinary trustees' fees and expenses incurred by Continental was $102,881.65; of this amount, Continental was entitled under Illinois law to receive immediately $61,138.58. On July 1, 1983, Continental deducted from the Trust's assets $40,-409.31 for fees and expenses, which was substantially less than the $61,138.58 it was entitled to receive immediately as of June 6, 1983. These deductions were reflected in the cash statements sent by Robert Paulsen to Mr. Eifrig on July 19, 1983.

As the Fee Petition reflects, there has been extensive activity in the state and federal litigation since June 6, 1983. Continental has incurred additional attorneys' fees and expenses of $66,375.60 from my firm alone from the period from June 7, 1983 through August 18, 1983. Continental intends to use every means at its disposal to recover these amounts, as well as the unpaid amount of $62,-472.34 that it previously incurred. The total amount of unpaid fees and expenses stands as of August 18, 1983 at $128,-847.94.

For the reasons set forth in Continental's June 29 motion and September 13 Fee Petition, Continental is presently entitled to be reimbursed from the Trust for $53,917.07 in fees and expenses and is very likely to be entitled to the remaining $74,930.87 in unpaid fees and expenses at the close of the litigation between Marshall Spiegel and Continental. Continental demands that the $128,-847.94 which it has incurred in fees and expenses and for which it has not been paid be deducted from the Trust's assets and placed in escrow within [the Bank of Highland Park] pending termination of the litigation.

Because of the high cost of the litigation, Continental further demands that [the Bank of Highland Park] maintain the non-real estate holdings of the Trust in a secure, liquid form in order to satisfy the ultimate amount of fees and expenses which the Trust will owe Continental when the litigation terminates. Given the manner in which Marshall Spiegel is conducting the litigation, it is very likely that all of the Trust's non-real estate assets will be consumed for such fees and expenses. Moreover, it would not be surprising if one or both parcels of the Trust's real estate had to be sold to satisfy fee bills if this litigation continues at the present pace. Continental holds [the Bank of Highland Park] responsible for insuring that the Trust's assets are available to pay Continental's fees and expenses. Continental will proceed against [the Bank of Highland Park] itself for these fees and expenses if the Trust's assets are not available. In light of these facts, it would be prudent for [the Bank of Highland Park] to refuse to permit substantial amounts of the Trust's assets to be placed into risky ventures or transferred away from [the Bank of Highland Park]." (footnotes omitted)

Continental filed a copy of this letter with the judge presiding over the state court litigation in the Cook County Circuit Court.

Continental moved to dismiss *Spiegel I* (then pending in the United States District Court) on the grounds that the court lacked subject matter jurisdiction [6] and that Spiegel failed to state a claim for relief under RICO. Spiegel argued to the district court that Davis' letters of July 13 and September 13 constituted two predicate acts of mail fraud in addition to the other acts of mail fraud alleged in his complaint (the mailing of the allegedly inaccurate quarterly financial statements and the June 10, 1982 Paulsen letter purportedly misrepresenting the Illinois laws and regulations of the Comptroller of the Currency applicable to the trust); the plaintiff claimed that the July 13 letter misrepresented the disposition of the proceeds of a municipal bond and that the September 13 letter urged that the Bank of Highland Park take an "improper action for the benefit of Continental." (We assume that the "improper action" Spiegel was referring to was Continental's request to the Bank of Highland Park to place $128,847.94 in escrow to reimburse Continental for incurred fees and expenses and to retain the remaining non-real estate assets in liquid form to pay future fees.) On January 5, 1984 the district court granted the defendant's motion for summary judgment,[7] concluding that Spiegel's complaint had alleged but one predicate act of mail fraud—the June 10 Paulsen letter allegedly misrepresenting the laws and regulations applicable to the Spiegel trust. The court held that Spiegel failed to state a claim for relief under RICO as he failed to allege a pattern of racketeering activity as required and defined in 18 U.S.C. § 1961(5).[8] With respect to the July 13 and September 13 Davis letters, the court stated, "Those statements are not alleged [in the complaint] and cannot form a basis for this action." The order accompanying the district court opinion recited merely, "defendants' motions to dismiss for want of subject matter jurisdiction are granted" because Spiegel had failed to allege two predicate acts of mail fraud and thus failed to state a claim under RICO.

*Spiegel II*

Spiegel chose not to appeal the court's decision in *Spiegel I,* but instead filed a new complaint in the federal court (*Spiegel II*) eight days after the district court's denial of Spiegel's motion to reconsider his dismissal of *Spiegel I.* *Spiegel v. Continental Illinois National Bank,* 609 F.Supp. 1083 (D.C.Ill.1985) (*Spiegel II*). *Spiegel II* named as defendants the same party defendants named in *Spiegel I,* and once more alleged that the same party defendants had committed a RICO violation, and added three pendent state law claims alleging that Continental had breached its fiduciary duty to Spiegel. The only relevant difference between the RICO claims in *Spiegel I* and in *Spiegel II* is the added allegation in *Spiegel II* of two additional predicate acts of mail fraud (the July 13 and September 13 letters authored by Davis). Continental moved to dismiss *Spiegel II* on the grounds that it was barred under the doctrine of res judicata based on the dismissal of *Spiegel I.*

. The district court recognized that because *Spiegel II* relied partially on acts that occurred after the filing of *Spiegel I* (the July 13 and September 13 letters), "the doctrine of *res judicata* does not bar *Spiegel II* to the extent that it is based on [those] acts which occurred after *Spiegel I* was filed." *Id.* at 1086. The court stated that except for the two newly-alleged acts of mail fraud, "*Spiegel II* is a reincarnation of *Spiegel I* and satisfies the three ele-

---

**6.** The record fails to disclose the grounds for Continental's assertion that the district court lacked subject matter jurisdiction.

**7.** Both parties presented "matters outside of the pleadings in support of their respective positions" and the district court "treat[ed] defendant's 12(b)(6) motions as though they were brought pursuant to Rule 56 [summary judgment]."

**8.** A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

ments of *res judicata."* *Id.* Referring to the newly alleged predicate acts, the district court held that the July 13 and September 13 letters were not acts of mail fraud on the grounds that "Congress could not have intended that the mail fraud statute sweep up correspondence between attorneys, dealing at arm's length on behalf of their parties, concerning an issue in pending litigation, especially where the presiding judge is aware of the alleged scheme and will ultimately rule on the acts in question." *Id.* at 1089. As an alternate ground for its holding, the court held that the "scheme" alleged by Spiegel was not "fraudulent" in "any typical sense of the word," *id.* at 1088, and also held that the July 13 and September 13 letters *"increased* the possibility that the scheme—if unlawful—would be remedied, and thus ... cannot as a matter of law be said to have furthered the scheme." *Id.* at 1090 (emphasis in original). In view of the court's ruling that Davis letters of July 13 and September 13 did not constitute acts of mail fraud, the court concluded that *Spiegel II* alleged only one predicate act of mail fraud (the June 10, 1982 Paulsen letter) and dismissed the remainder of Spiegel's RICO claim as barred under the doctrine of *res judicata.* Since the dismissal of the RICO claim eliminated the only basis for the district court's subject matter jurisdiction, the court also dismissed Spiegel's pendent state law claims. Spiegel appealed.

## II

Before turning to the issues raised in this appeal, we outline the civil provisions of RICO. Section 1964(c) of Title 18, U.S.C., provides:

"Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys' fee."

Section 1962 defines conduct prohibited under RICO, and for the present case, the most pertinent provision is § 1962(c):

"It shall be unlawful for any person employed by or associated with the any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

"Racketeering activity" is defined in a list of various state and federal offenses, including mail fraud in violation of 18 U.S.C. § 1341. A "pattern of racketeering activity" is established with proof of the commission of at least two acts of racketeering activity (commonly referred to as predicate acts) within a ten-year period. 18 U.S.C. § 1961(5). Although Congress enacted RICO as a tool in the fight against organized crime, *see Schacht v. Brown,* 711 F.2d 1343, 1357 (7th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 509, 78 L.Ed.2d 698 (1983), the broad language of the RICO statute resulted in plaintiffs seeking treble damages under RICO in civil commercial disputes that otherwise would only involve a breach of contract suit, or securities, or state law fraud claims. *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 386–87 (7th Cir.1984), *aff'd,* —— U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). In the present case (*Spiegel II*), Spiegel argues that the conduct of Continental constitutes a violation of RICO supporting an award of treble damages.

### Res Judicata

Initially we address the issue of whether the district court's dismissal of *Spiegel I* bars Spiegel's present action (*Spiegel II*) under the doctrine of *res judicata.* Spiegel contends that the doctrine of *res judicata* should not be interpreted as a bar to his complaint in *Spiegel II,* arguing that the court dismissed *Spiegel I* only on the grounds of lack of subject matter jurisdiction and thus made no determination on the merits as is required for the application of the doctrine of *res judicata.*

■ "The law in this circuit is that *res judicata* applies when there is '(1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits.'" *Buckhalter v. Pepsi-Cola General Bottlers, Inc.*, 768 F.2d 842, 852 (7th Cir.1985) (quoting *Lee v. City of Peoria*, 685 F.2d 196, 199 (7th Cir.1982)). With respect to the initial requirement that the final judgment in the previous action must have been on the merits, we note that "a judgment on the merits is one which 'is based upon legal rights as distinguished from mere matters of practice, procedure, jurisdiction, or form.'" *Harper Plastics, Inc. v. Amoco Chemicals Corp.*, 657 F.2d 939, 943 (7th Cir 1981) (quoting *Fairmont Aluminum Co. v. Comm'r*, 222 F.2d 622, 627 (4th Cir.), *cert. denied*, 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748 (1955)). Thus, "A dismissal for failure to state a claim upon which relief can be granted ... is a dismissal on the merits and is *res judicata*," while "[a] dismissal for lack of subject matter jurisdiction is *not* on the merits and will not bar a later suit." *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1277 (7th Cir.1983) (emphasis in original); *see also Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n. 3, 101 S.Ct. 2424, 2428 n. 3, 69 L.Ed.2d 103 (1981). In *Spiegel I*, Continental's motion to dismiss relied upon both Fed.R.Civ.P. 12(b)(1) (lack of subject matter jurisdiction) and 12(b)(6) (failure to state a claim upon which relief can be granted). In discussing the procedural context of the case, the district court's opinion in *Spiegel I* recited, "Defendants' motions to dismiss are purportedly brough pursuant to Federal Rule of Civil Procedure 12(b)(6) (failure to state a claim upon which relief can be granted under RICO)." The district judge, without any discussion of the subject matter jurisdiction over Spiegel's claims, but ruling exclusively on the factual allegations of Spiegel's

complaint, held that "[s]ince the plaintiff has failed to allege two or more examples of racketeering activity, the plaintiff has *failed to state a claim under RICO*. Thus, defendants' motions for summary judgment as to the RICO count are granted." (emphasis added) Since "[a] dismissal for failure to state a claim upon which relief can be granted ... is a dismissal on the merits," *Bunker Ramo*, 713 F.2d at 1277, we conclude that the district court opinion granting summary judgment because Spiegel failed to state a claim was a judgment "on the merits." [9]

■ It is undisputed that the parties named in *Spiegel II* are the same parties named in *Spiegel I* and thus satisfy the requirement that there be an identity of parties to invoke the doctrine of *res judicata*. The final requirement for the application of *res judicata* is that the two actions allege the same cause of action. This circuit has announced the following test for determining whether two suits are based on the same cause of action:

> "[A] cause of action consists of a single core of operative facts which give the plaintiff a right to seek redress for the wrong concerned.... If the same facts are essential to the maintenance of both proceedings or the same evidence is needed to sustain both, then there is identity between the allegedly different causes of action asserted, and *res judicata* bars the later [action]."

*Lee v. City of Peoria*, 685 F.2d at 200 (quoting *Morris v. Union Oil Co. of California*, 96 Ill.App.3d 148, 51 Ill.Dec. 770, 777, 421 N.E.2d 278, 285 (1981)). In both *Spiegel I* and *Spiegel II*, the plaintiff alleged: (1) first that Continental failed to invest trust income promptly and second that Continental used the trust income for its exclusive benefit before timely investing the same; (2) that Continental failed to disclose the fact of its failure to properly invest trust assets in the quarterly finan-

**9.** In addition, we note that the district court in *Spiegel I* treated the defendants' motion to dismiss as a motion for summary judgment. The only motion under Fed.R.Civ.P. 12(b) that can

be considered as a motion for summary judgment is a motion pursuant to 12(b)(6), failure to state a claim upon which relief can be granted.

cial statements sent to Spiegel; (3) that the defendant Paulsen mailed a letter to Spiegel containing misrepresentations concerning Continental's duty under applicable laws and regulations to reinvest trust income; and (4) that this conduct violated RICO. In *Spiegel II*, the plaintiff added two new allegations: (1) the July 13 letter from Davis to Spiegel's counsel; and (2) the September 13 letter to Spiegel's counsel and Eifrig. Thus, except for the July 13 and September 13 letters alleged in *Spiegel II*, all of the allegations recited in *Spiegel II* (the alleged wrongful conduct of the defendant, the alleged harm to Spiegel (Continental depriving him of interest on trust funds not timely transferred to principal) and the alleged acts of mail fraud (the allegedly inaccurate quarterly financial statements and the Paulsen letter)) are essentially identical to the allegations set forth in *Spiegel I*. If not for the newly alleged predicate acts of mail fraud (the July 13 and September 13 letters), *Spiegel II* would be barred in its entirety under the doctrine of *res judicata*. In view of the fact that the two newly-alleged predicate acts of mail fraud occurred after the filing of *Spiegel I*, we agree with the district court's ruling that "the doctrine of *res judicata* does not bar *Spiegel II* to the extent it is based on acts which occurred after *Spiegel I* was filed." *Spiegel II*, 609 F.Supp. at 1086.

### The July 13 and September 13 Letters

We now turn to the issue of whether the letters that Continental's attorney Scott Davis sent to Spiegel's counsel dated July 13, 1983 and September 13, 1983 were acts of mail fraud constituting a pattern of racketeering activity under RICO. The statute defining mail fraud, 18 U.S.C. § 1341, states, *inter alia:*

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office [is guilty of mail fraud]."

Thus, to prove mail fraud under RICO, the plaintiff must establish (1) that the defendant participated in a scheme to defraud; and (2) that the defendant caused the mail to be used in furtherance of the scheme. *United States v. Bonansinga*, 773 F.2d 166, 168 (7th Cir.1985); *see also Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). "Congress has decided not to define 'scheme or artifice to defraud,' because the range of potential schemes is as broad as the criminal imagination." *Bonansinga*, 773 F.2d at 173. Although Congress did not specifically define the phrase "scheme to defraud," it need not have defined the phrase as its meaning is so evident. Courts have concluded that "[i]t is not necessary that the scheme be fraudulent on its face but the scheme must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979).

The plaintiff's complaint in *Spiegel II* alleges that the defendants engaged in a scheme intended to defraud the Oscar Spiegel Trust and Marshall Spiegel of a substantial portion of the corpus of the trust and trust income. Specifically, Spiegel alleged that the trust administered by Continental as trustee "would be charged excessively for the administration of the said trusts and/or the earnings would not be paid over to the trust." Spiegel also alleges that the trust income was placed "in non-interest bearing demand" accounts in Continental for periods up to and exceeding 90-days and that earnings from the non-interest bearing accounts were "expropriated and removed" by the defendants for the benefit of Continental.

Spiegel alleged that the defendants sent several mailings in furtherance of this purported fraudulent scheme. In particular, Spiegel cites the periodic financial opera-

tional statements mailed to Marshall Spiegel and other "beneficiaries trustee's" (sic) that allegedly failed to disclose that Continental had placed trust income in non-interest bearing accounts, invested the income for Continental's exclusive benefit, and failed to disclose the amount of cash balances left uninvested. Spiegel also alleged that the June 10 letter from the defendant Robert Paulsen to Spiegel misrepresented that the applicable laws and regulations governing the trust prohibited the investment of trust income unless first transferred to trust principal pursuant to the terms of the trust. Spiegel's complaint further alleged that a letter dated February 22, 1982 from Robert Paulsen to Spiegel recited, "I ... enclose a copy of the Investment review dated 12–31–81 which lists all of the trust assets," while the enclosed Investment review allegedly failed to specify the correct cash balance (Spiegel asserted the correct cash balance was $1,116.91 rather than $861.93 reflected in the Investment review), concealed the total uninvested cash and security deposits, and failed to disclose Continental's earnings on funds rightfully belonging to the trust. The complaint alleged that the July 13, 1983 letter from Continental's attorney Davis to Spiegel's counsel misrepresented that a municipal bond had been collected and credited to the trust account, when instead Continental allegedly embezzled the proceeds of the bond and also alleged that the September 13, 1983 letter from Davis to Spiegel's counsel and William Eifrig of the Bank of Highland Park misrepresented the law of Illinois (without specifying how), failed to disclose certain facts related to the state court litigation, and set forth Continental's claimed right to allegedly exaggerated sums for trust and legal services and expenses.

■ In *Spiegel I*, the district court concluded that the plaintiff's allegation that Continental failed to disclose the amount of profit earned and retained as a result of its policy of placing trust income in non-interest bearing accounts and crediting the income to the trust principle only on a quarterly basis failed to constitute a fraudulent

scheme within the meaning of 18 U.S.C. § 1341. Further, the court in *Spiegel I* concluded that Continental's alleged failure to list refundable security deposits (from tenants leasing trust property) as trust assets on trust financial statements was not fraudulent conduct. Since these claims have already been considered and rejected by the district court in *Spiegel I* and Spiegel chose not to appeal that decision, we are barred from further consideration of these issues under the doctrine of *res judicata*. We next address the issue of Spiegel's allegations of fraud regarding the letters of July 13 and September 13 that were not before the court in *Spiegel I*.

■ Spiegel alleged that the letter of September 13 furthered the fraudulent scheme set forth above, and specifically asserted without specifying in what manner the letter misrepresented the law of the State of Illinois. Speigel also alleged that the September 13 letter failed to disclose that Spiegel had attempted to terminate Continental as trustee in August, 1981, failed to disclose that Continental filed a petition for fees in the Cook County Circuit Court that was denied, and failed to disclose that Robert Paulsen had admitted in his deposition in the state court proceedings that the Continental trust department failed to keep time records and thus could not accurately specify the amount of time spent on the Oscar Spiegel trust. Spiegel's complaint failed to explain how the September 13 letter misrepresented Illinois law nor are we able to ascertain from either his complaint or the September 13 letter the content of the purported misrepresentation. We note the only mention of Illinois law in the letter of September 13 is, "As of June 6, 1983 ... Continental was entitled under Illinois law to receive immediately $61,138.58" as attorneys' and trustee's fees and expenses. We are at a loss to understand how this statement in Davis' letter to Spiegel's counsel stating that Continental believed it was entitled to receive compensation for the amount of time spent on legal matters, trust fees, and other incidental expenses incurred can be construed as a

misrepresentation of Illinois law. Further, when the September 13 letter was written, Spiegel's counsel knew that Spiegel had attempted to remove Continental as trustee in 1981 since that fact was alleged in the *Speigel I* complaint. Spiegel's counsel presumably was also aware that the Circuit Court of Cook County had denied Continental's motion for fees on June 29, since his present counsel also represented him in the state court litigation, and his counsel also was aware of the content of Robert Paulsen's deposition testimony in the state court litigation since he handled the examination of Paulsen at the deposition. From the above-stated facts, it is evident that Speigel's counsel, who participated in all of the pre-trial and trial proceedings in the state court matters, had full knowledge of all the facts that Continental allegedly failed to disclose in the September 13 letter. We are unable to understand how Spiegel can allege a fraud based upon the alleged failure to disclose facts to an attorney who has been an active participant in the litigation from its inception and thus is fully aware of all of the facts.

The *Spiegel II* complaint also alleges that the September 13 letter was part of the overall fraudulent scheme to increase the amount of attorneys' and trustee's fees allegedly owed to Continental and thus deprive Spiegel of an unspecified amount (interest) due from the Oscar Spiegel Trust. The plaintiff Spiegel alleged that this fraudulent scheme consisted of the filing of: 1) the suit in Cook County Circuit Court to determine whether the trust agreement mandated a qualified corporate successor trustee; 2) the appointment of a trustee to protect the interest of the plaintiff's unborn children in the state court litigation; 3) attempting to obtain a lien against the trust for "exaggerated sums for trust services, legal services and other expenses which had no relationship to" the state court litigation; and 4) the continuance of the concealment of the removal of $40,-409.31 as fees and the continuing dissipation of trust assets. With respect to the July 13 letter, the complaint in *Spiegel II* alleged that the letter of July 13 falsely

represented that an Albuquerque, New Mexico municipal bond in the amount of $25,000 was collected and credited to the trust account, claiming that the proceeds of the bond were instead embezzled by the defendants.

Continental commenced the interpleader suit in the state court to determine whether it was proper for Spiegel to act as sole trustee of the trust under the terms of the trust agreement or whether the trust agreement by its very terms required a qualified successor corporate trustee. After the Illinois courts determined that the very language of the trust agreement mandated that the trust have a qualified corporate trustee, Continental deducted $40,-409.31 from the trust assets as they believed they were entitled to this amount as attorneys' fees and expenses incurred in litigating the question of whether the trust agreement required a corporate trustee, and promptly disclosed this deduction in the July 13 letter from Continental's counsel Scott Davis to Spiegel's counsel. The July 13 letter also recited that Continental was confident Spiegel would not agree with the bank's retention of $40,409.31 and acknowledged that the matter would ultimately have to be resolved by the judge in the pending state court litigation. The September 13 letter once again recited that Continental retained the sum of $40,409.31 as attorneys' fees, explained Continental's position concerning additional fees it claimed the trust owed to Continental, requested the Bank of Highland Park to place sufficient trust funds in escrow to cover the additional claimed fees pending termination of the state court litigation, and informed the state trial judge of the status of the fee dispute. With the case pending in the Cook County Circuit Court, the circuit court had ample opportunity to protect the plaintiff's interest in the trust assets and possessed the power to order Continental to return the funds it deducted (with interest, if necessary) if the state court were to find that Continental's claim for fees was unwarranted under Illinois law. Since the Cook County Circuit Court

was in a position to resolve Continental's alleged fees due from the trust assets and because these two letters fully advised Spiegel's counsel of Continental's deduction of funds from the trust and clearly set forth its reasoning for deducting the funds, we conclude that Spiegel's allegation that this was a "scheme" to deprive Spiegel of trust assets is without merit. Moreover, Continental's alleged conduct did not involve any fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension, and therefore was not fraudulent.[10]

■ Furthermore, in establishing a RICO violation, the mailings alleged must be in furtherance of the purportedly fraudulent scheme. *Bonansinga,* 773 F.2d at 168. In *United States v. Wormick,* 709 F.2d 454, 462 (7th Cir.1983), this court explained that:

"Mailings are in furtherance of a scheme if they are incidental to an essential part of the scheme. *Pereira v. United States,* 347 U.S. 1, 8–9 [74 S.Ct. 358, 362–63, 98 L.Ed. 435] (1954). Under this definition, mailings made after the scheme has reached its fruition are not in furtherance of the scheme. *United States v. Maze,* 414 U.S. 395 [94 S.Ct. 645, 38 L.Ed.2d 603] (1974), nor are mailings which conflict with the purposes of the scheme and have little effect upon the scheme. *United States v. Staszcuk,* 502 F.2d 875 (7th Cir.1974)."

709 F.2d at 462 (quoting *United States v. Rauhoff,* 525 F.2d 1170, 1176 (7th Cir. 1975)). This court recently held in *Bonansinga* that a mailing of a communication could not be considered as being in furtherance of a scheme and thus not an act of mail fraud when the communication placed the allegedly defrauded party on notice of the purported fraud, making it more likely that the defendants' scheme would be detected. 773 F.2d at 172. Similarly, in the case before us, Continental's letters to Spiegel of July 13 and September 13 placed him on notice of its deduction of fees from trust assets and its position regarding additional fees (indeed the September 13 letter placed the state court judge on notice of Continental's actions). Rather than further the alleged scheme, the letters of July 13 and September 13 counteracted the purposes of the purported "scheme" and made it more likely that the alleged "scheme" would be uncovered. We conclude, as did the *Bonansinga* court, that a letter alerting the plaintiff to the alleged scheme cannot and will not be considered in furtherance of the alleged scheme and thus does not constitute an act of mail fraud. Furthermore, the two letters from Continental's attorney were mailed after the $40,-409.38 had been deducted as attorney's fees. Thus our conclusion that the alleged mailings were not in furtherance of the alleged scheme is buttressed by the fact that the mailings were sent after the alleged scheme had reached its fruition. *See United States v. Wormick,* 709 F.2d at 462.[11]

Since the July 13 and September 13 letters fail to constitute acts of mail fraud, we hold that Spiegel's complaint in the present action fails to set forth a pattern of racketeering activity as required to state a claim for treble damages under RICO. Accordingly, we dismiss Spiegel's RICO claim, and

---

**10.** Spiegel's complaint alleged that the July 13 letter misrepresented the disposition of an Albuquerque, New Mexico municipal bond "as the funds from this bond were embezzled by the defendants herein and not furnished to First National Bank of Highland Park." Davis' July 13 letter stated "much of the Trust's cash was used to pay some of Continental's attorneys' and trustees' fees and expenses. Continental will shortly send to Marshall Spiegel a final cash statement showing the amounts so used." Thus, rather than misrepresenting the disposition of the municipal bond, Continental fully informed

Spiegel that some of the proceeds were applied to Continental's claimed fees.

**11.** As we conclude that the July 13 and September 13 letters were not acts of mail fraud, we need not address the alternate grounds advanced by the district court that Congress did not intend the mail fraud statute to reach "correspondence between attorneys, dealing at arms length on behalf of their parties, concerning an issue in pending litigation." *Spiegel I,* 609 F.Supp. at 1089.

since the RICO claim provided the only basis for federal jurisdiction, we also dismiss the pendent state law claims for lack of subject matter jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 716, 86 S.Ct. 1130, 1134, 16 L.Ed.2d 218 (1966).

### III

Continental has filed a motion for an award of double costs and damages on appeal, including the reasonable attorney's fees incurred in its defense of this appeal pursuant to Fed.R.App.P. 38, arguing that Spiegel's appeal is "utterly frivolous and has been brought out of sheer obstinacy to harass appellees." Rule 38 provides:

> "If a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee."

■ "An appeal is frivolous when the result is obvious or when the appellant's argument is wholly without merit." *Indianapolis Colts v. Mayor and City Council of Baltimore*, 775 F.2d 177, 184 (7th Cir. 1985); *see also International Union of Bricklayers & Allied Craftsmen Local Union No. 20, AFL–CIO v. Jaska*, 752 F.2d 1401, 1406 (9th Cir.1985). After reviewing the arguments advanced by the plaintiff-appellant, we conclude this appeal was frivolous within the meaning of Rule 38 as the result of his appeal should have been obvious from the outset. Furthermore, we note that the appellant's brief failed to explain how the district court decision was in error. Specifically, Spiegel's brief neglected to even discuss the applicability of the doctrine of *res judicata* to *Spiegel II*. Spiegel's brief further failed to delineate how the July 13 and September 13 letters were fraudulent stating only that the letters "merely continued the scheme to defraud," without specifying the nature of the allegedly fraudulent scheme, and asserting in a conclusory fashion without any explanation or delineation that "[e]ach mailing is a separate act of mail fraud." Instead of presenting logical arguments for reversing the district court's dismissal of *Spiegel II*, Spiegel's brief digressed at great length concerning Continental's alleged breach of its fiduciary duty to Spiegel (an issue neither addressed by the district court nor before us on appeal). A brief such as Spiegel's that fails to clearly and cogently present arguments for overturning the district court decision is of little or no help to this court and causes us to doubt whether the appellant prosecuted the appeal with any reasonable expectation of altering the judgment of the district court. Indeed, in *Bugg v. International Union of Allied Industrial Workers of America, Local 507 AFL–CIO*, 674 F.2d 595 (7th Cir.), *cert. denied*, 459 U.S. 805, 103 S.Ct. 29, 74 L.Ed.2d 43 (1982), we concluded that an appeal was frivolous where the district court found the plaintiff's claims to be "entirely groundless," and on appeal the plaintiff "in a perfunctory brief ... failed to present any arguable reason why the district court erred in its disposition. He basically restates arguments that the lower court properly rejected." *Id.* at 600; *see also Hilgeford v. Peoples Bank*, 776 F.2d 176, 179 (7th Cir.1985) (An appeal was held to be frivolous when, *inter alia*, the appellants "failed to support their claim of jurisdiction by citing relevant authority or by refuting the district court's analysis.").

■ The court, in addition to finding an appeal frivolous, must also make a second determination regarding the imposition of costs and attorneys' fees pursuant to Rule 38: Is the case an "appropriate one for the imposition of sanctions?" *Indianapolis Colts*, 775 F.2d at 184. In determining whether sanctions are appropriate, courts look for an "indication of the appellant's bad faith suggesting that the appeal was prosecuted with no reasonable expectation of altering the district court's judgment and for purposes of delay or harassment or out of sheer obstinacy." *Reid v. United States*, 715 F.2d 1148, 1155 (7th Cir.1983). "The purpose of [Rule 38] is twofold. First, it operates to compensate winners of judgments in the district court for the expense and delay of defending against meritless arguments in the court of appeals. Second, it seeks to deter such

appeals and thus to preserve the appellate court calendar for cases worthy of consideration." *Ruderer v. Fines,* 614 F.2d 1128, 1132 (7th Cir.1980). In *Ruderer* we concluded that an award of damages was necessary "to curb the appellant's litigious proclivities." *Id.* at 1133. Similarly in this case, we view the appellant's conduct in pursuing this senseless litigation as an attempt to harass the defendants and we believe an award of double costs and attorneys' fees is proper.

## IV

The decision of the district court is AFFIRMED and the defendants-appellees are awarded double costs and reasonable attorneys' fees on this appeal. The defendants-appellees shall file a statement as to their fees and costs on appeal within 15 days of the date of this opinion.